20-5002 Jason Leopold and Buzzfeed Inc. v. Central Intelligence Agency, Appellants Mr. Biusa for the Appellants, Mr. Light for the Appellee Good morning, and may it please the Court, Joe Biusa on behalf of the Government. Plaintiffs don't dispute that the information at issue in this FOIA case is classified, that it relates to CIA sources and methods, that its disclosure would damage the national security, and that it therefore falls within the protections of FOIA Exemptions 1 and 3. The Government could be compelled to release this protected information only if it had unambiguously already done so in a prior official acknowledgement. Because the Government has never acknowledged the specific information at issue here, it remains protected, and the District Court's disclosure order should be reversed. Plaintiffs have the burden of identifying specific prior statements that they say constitute an official acknowledgement. Here, they identify a single 20-word tweet sent late at night, whose core message is that an unspecified newspaper article, quote, end quote, in an unspecified way. This is miles away from the kind of official acknowledgement this Court would require to overcome the Government's glomar response here. That is so for two reasons. First, the tweet doesn't say that there were payments to Syrian rebels that the President knew about and ended. Second, even assuming that the tweet did say something like that, it certainly says nothing whatsoever about the CIA and whether the CIA has an intelligence interest in that subject or doesn't, or whether the CIA has the intelligence-gathering capability to learn about such alleged payments by unknown entities to Syrian rebels. What about the statement the following day in the interview to the Wall Street Journal that says, that was not something I was involved in other than they came and they suggested, it turns out it's a lot of Al-Qaeda we're giving these weapons to? I have three things to say about that, Your Honor. First, is that plaintiffs have affirmatively waived any argument that the interview is an official acknowledgement of anything. Here I'm quoting from plaintiffs' submissions to the District Court. It's docket 11, page 1, footnote 1, where plaintiffs say, the only question the Court needs to address is the impact of the tweet on what would otherwise have been a valid glomar response. And so plaintiffs should not now be taken to raise an entirely new argument on appeal that they affirmatively conceded away in District Court. The District Court took them at their word, and in fact only analyzed the tweet. And it's too late to raise a new argument. But even if the interview were to come in, Your Honor, I have two substantive responses. First, just like the tweet, the interview says nothing, not one word about the CIA, its intelligence interests or lack thereof in this arena, or its intelligence gathering capability or lack thereof in this arena. That's the specific protected information issue. And the interview says nothing about it one way or the other. And also, secondly, my second substantive point on that is that the tweet actually doesn't even say anything about acknowledging payments to Syrian rebels. Those words appear in the tweet as the subject of the FOIA request here, and the interview doesn't say anything about that issue. In fact, it's even more ambiguous than the tweet. It talks about a decision. But it says a lot of al-Qaeda we're giving these weapons to. Your Honor, there's no – Assuming just for the sake of argument that we can consider it, I take your point that this may be waived. But if we can consider it, isn't that an acknowledgment that the U.S. has given weapons to al-Qaeda? And isn't it basically common knowledge that the CIA has an intelligence interest in al-Qaeda? Your Honor, there is no basis to assume or speculate that the CIA would have any intelligence interest or knowledge about an alleged program of payments to Syrian rebels. If that were the law, the ACLU opinion would have read very differently. In ACLU, it was undisputed that the U.S. government used drones in targeted killings. The question was whether the CIA had an intelligence interest in that subject. And the opinion would have been very short if it had just rested on the grounds you just outlined there. Instead, consistent with this court's longstanding specific match test, the court there looked to the CIA director's statements acknowledging intelligence interest. What are we to do with the language on the ACLU v. CIA opinion from 2013 that appears at the beginning of page 430 of 710F3? The paragraph that says, given these official acknowledgments that the U.S. has participated in drone strikes, it is neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the agency at least has an intelligence interest in such strikes. The court reaches that conclusion before even getting to the pages and pages more that it says about the CIA director's statements, etc., etc. It seems to be holding there that before we even take any of that into account, it's not logical or plausible for the CIA to say that they don't have an intelligence interest in drone strikes. Your Honor, we think ACLU is best read as being consistent with prior precedent that bound the panel outlining the specific match test. This court has long made clear for about 40 years now that in order to overcome an official acknowledgement, plaintiffs have to identify prior statements that are as specific as and match the specific protected information. This court said in Wolfe that this court insists on exactitude in order to protect important national security interests and that speculation, no matter how widespread, is no basis for finding an official acknowledgement because anything less than that exacting standard would provide insufficient protection for CIA sources and methods. As this court said in Gardel's, an official acknowledgement ends all doubt. That's why what this court said in ACLU is true, that this court demands a prior statement that, quote, leaves no doubt, end quote, about the content of the protected information. Now, taking all of that into account, we just don't think that that paragraph that you were reading from is the holding of the case. The case ultimately rested on the specific statements from the CIA director. And that's consistent with the prior precedent, and that's also how this court has read ACLU after ACLU was issued. We cite at page 41 of our opening brief a case in which this court characterized ACLU as ultimately resting on those specific statements from the CIA director. And, you know, a panel would just not have the ability to change the preexisting specific match test. That's all we have. I'm sorry. Suppose we disagree with you regarding the first of the two inferences. In other words, we think there's acknowledgement that the United States government at some point was supporting Syrian rebels. And then you say, but there's a second inference, which is, and a second protected fact, which is whether or not the CIA was involved in that. If we just looked at all of the federal statutes creating all of the intelligence and military entities of the government, would we find that there are agencies besides the CIA that could have been involved in doing this, in supporting Syrian rebels? I have two responses, Your Honor. The first is that there's no basis to assume that this would have been the United States government program, even if you take the tweet or the interview or the combination thereof as acknowledging the President's knowledge about some payments to Syrian rebels. That's the basis on which this case was litigated in district court. The district court made clear that, at most, the tweet could be thought to be official acknowledgement of the President's knowledge of payments. But the district court acknowledged, and so do plaintiffs, that even taking into account the tweet and the interview, such alleged payments could have come from anyone, including foreign entities, which is why it's very important to understand. Sorry, just make sure I get this. You would say one plausible reading of the tweet, the President talks about my, the President's word, my ending massive, dangerous, wasteful payments to rebels could mean that some foreign government was supporting Syrian rebels. The President didn't like it, and he cajoled the foreign government to end payments. That's exactly right. That's what the district court said here. In fact, I don't even believe it was limited to foreign governments. I mean, any other foreign entity or any non-U.S. government entity could be at play there. And so that's one answer to Your Honor's question, which is that we're really not just dealing with the U.S. intelligence community. Hang on. So just to play that out, let's assume again, for the sake of argument, that we consider the statement to the Wall Street Journal. Then what do we do with the statement? Turns out we're giving weapons to Al Qaeda. What's the plausible reading of that that would not reference some United States government entity? It's the same as the my ending phrase from the tweet, which is just that, you know, the use of the first person in the one instance or, you know, the we in the second instance could encompass a broader coalition or, you know, the President working in conjunction with some other entity using his influence. We could be some secret coalition. Hypothetically, yes, Your Honor. And the key issue here is that an official acknowledgement ends all doubt. That's why there has to be an unambiguous official acknowledgement. And we just don't have that here, even on the first prong of what we're talking about here, much less about the CIA's interest or involvement one way or the other. So assume I get that argument. Let's assume we disagree with you on that point. And then what's your answer? We assume there's acknowledgement as to some U.S. entity. What's your answer to my question about just purely hypothetically looking at the face of the statutes? Is there some other U.S. entity that could have been doing this? Hypothetically, you know, one, I think the answer is going to be yes, but I don't think it's on us to identify a specific other agency that could have done the alleged payments at issue here. The intelligence community comprises 17 entities. They all have different legal authorities. And it is not a matter of indifference to the U.S. government and its national security, you know, whether or not the CIA is publicly acknowledged to be involved in any even acknowledged U.S. government activity. That's because of the differences in the legal authorities available to the CIA versus, you know, other potential actors, whether those authorities are invoked could itself disclose other properly protected national security information. And just to be very specific here, the tweet says nothing at all about the CIA and its intelligence interests or lack thereof, its capacity or lack thereof regarding the subject here. That's the specific information at issue. And the specific match test is therefore not satisfied. Is it really a burden? Is this really a burden of production question? I mean, they say they say there's official acknowledgement as to the United States. And the only reasonable way to read that is to loop in the CIA. And my reaction to that is, well, that just tees up a legal question about whether any other military or intelligence entity could have been involved other than the CIA. In other words, the plausibility inquiry that ACLU arguably mandates turns on a legal question of which agencies have which authorities. No, Your Honor, I don't think the government is required to give up protected information in order to protect other protected information. I mean, I'm not asking I'm not asking you about which agency was involved. I'm just asking you about is there any other agency that could have been in that would have had statutory authority potentially to be involved? I don't know, Your Honor, and I don't think I'm in a position to give you a specific answer on that subject. The key here, though, is that the government has never officially acknowledged that there even were payments, much less that the US government would have been the one involved much instead of somebody else. And finally, and most importantly, none of these statements say anything about CIA involvement. If the rule were that official acknowledgement of a program is enough to make the CIA either confirm or deny its involvement or point the finger at somebody else instead, ACLU would have been a very different opinion. ACLU does not read that way. Instead, it reads consistent with this court's 40 years of precedent on this subject. It relies on the specific statements of the CIA director. There's no analog of those statements here. Plaintiffs don't say otherwise. Instead, the district court's disclosure order here relies on nothing more than speculation. The district court's assumptions about the CIA's interests and capabilities in this arena, but this court has made clear that speculation, no matter how widespread, cannot be the basis for an official acknowledgement because of the important underlying interests in national security. Let me ask one broad question. Do you find, is there any difference between the New York Times versus CIA case and the Second Circuit in this case? I don't see any material difference between those two cases, Your Honor. And I think that's another reason going in our favor. The panel there took a look at the exact statements that plaintiffs here point to as being alleged official acknowledgements. And the panel in the Second Circuit correctly concluded that, look, the tweet doesn't say that there were payments and the president ended them. Instead, the core message is criticism of the underlying article. And, you know, as we point out in our reply brief, if Alice says that Bob destroyed a car and Bob says that Alice lied about my destroying a car, that does not mean that Bob is saying there was a car, right? The only, you know, necessary inference from the gerund and the possessive in front of the gerund, my destroying, is a reference to the allegation, not a confirmation. It might be a little different if Bob says Alice lied about my destroying a red, shiny, beautiful new Cadillac. Again, as we point out in our reply brief, the characterization here of massive, dangerous, and wasteful can be understood as the president's editorial gloss on the descriptions in the underlying article. You know, we cite specific portions of the underlying article that could be thought of in that way. That's exactly how the Second Circuit, getting back to Judge Randolph's question, thought about this question. The Second Circuit understood that, you know, that is at least a plausible understanding of this tweet, and therefore the tweet does not constitute an official acknowledgment. And this court should reach the same conclusion for the same reasons. All right, are there any other questions? All right, we'll hear from you on rebuttal. Thank you. Mr. Light? Good morning, Your Honor. May it please the court, Jeffrey Light on behalf of appellees Jason Leopold and Buzzfeed. The Glomar Doctrine is a judicial gloss on the statutory text of FOIA. It's a legal fiction which allows an agency to refuse to confirm or deny the existence of records, even when it's obvious to the whole world that the agency maintains such records. In this case, after the Washington Post story revealed that the CIA programmed to the world, the government was still entitled to its fig leaf because of the need for the official government position to be one of plausible deniability. However, this need ended once the president himself, in his official capacity, removed that fig leaf. The precise Glomar fact that the CIA wants to maintain plausible deniability about is set forth on page 12 of their reply brief, which refers to Joint Appendix 18, in which they say that the Glomar fact is that a revelation would show that the agency had involvement in, knowledge of, interest in, and or a connection to such programs. But the wording of the actual FOIA request is far broader than that. It's a nine-part FOIA request that specifically duplicates the language in President Trump's tweet, specifically any and all records mentioning or referring to, quote, the ending of payments to Syrian rebels fighting Assad. This is far different than what happened in the Second Circuit case where the FOIA request was specifically about a CIA program. And that makes that case similar to the prior Leopold case, which was aimed at a CIA program in particular, and we lost that case. But the district court recognized here that the nine-part FOIA request here was much different. The CIA — Has the New York Times case — has the New York Times petitioned for certiorari or rehearing in bank? No. That case is final. Yeah. Time has run out, right? I believe so. As far as the breadth of the FOIA request in our case, the government finds that problematic because they argue that it leaves room for speculation if they were to acknowledge the existence of records about which particular aspect of the FOIA request they are responding to. But that's the whole point of the GLOMAR doctrine is to give the government enough leeway to leave enough doubt for them to have plausible deniability. The broader the FOIA request, the more room they have to say, yes, we acknowledged that there are documents that exist with respect to one of these nine parts, but we can deny a specific fact, the specific GLOMAR fact that they want to assert here. In response to Judge Katsas' questioning about whether there were other agencies that might have had authority to have engaged in this, I'm not sure that there are any. I can't speak definitively to that. But assuming hypothetically that there was, the question is then would the CIA, would it be obvious that the CIA has an interest in a sister agency conducting that? And I think that it would be implausible for the CIA to say, we didn't know or we have no interest whatsoever in the Department of Defense doing this type of operation. It does not, acknowledgement would not. How do we know that? I mean, intelligence community is known for sometimes being more siloed than it should be. And not every agency always knows what every other spy agency is doing. Well, I think what's important here is the temporal scope of this FOIA request. Keep in mind that this FOIA request was made after the New York Times story, after the president spoke to the Wall Street Journal and after his tweet. So the CIA would have to maintain plausible deniability that it had no interest after reading about these programs in the New York Times, after reading about the Wall Street Journal, after reading about the tweet. And so regardless of where the program originated, another government agency, a foreign agency, wherever, the CIA's burden here is to show what it asserts, the glow mark fact. The CIA did agree to provide information relating directly to the tweet. Is that correct? That's correct. And have you received that information? We received that information in the first Leopold case, and therefore in the second Leopold case, we did not request to have the same information provided again. But whether or not the CIA has documents reacting to the president's tweet is a different question from whether or not they have interest in a program that they allegedly conducted after that was revealed in the New York Times. They certainly have interest, even if they didn't have or know about the program before, they certainly have an interest in it once it was revealed to the public that they allegedly had such a program. But wouldn't that, the interest after the tweet, wouldn't that be covered by what the CIA agreed to provide? I mean, for example, suppose a CIA case officer emails another and saying, what the heck is the president talking about in that tweet? That would be covered, wouldn't it? No. I mean, that would be disclosed. The disclosure was only for documents that would not have revealed the existence or non-existence of the program. So if somebody said, what the heck is the president talking about? I think that would suggest that the program doesn't exist. If it was simply, how should we respond to the press? That was the kind of thing that was covered and released to us. The government argues, as far as how to interpret the tweet, that the terms massive, dangerous, and wasteful could be understood not as the president's words, but as those of the Washington Post. And certainly language is imprecise and almost any statement can be endowed with ambiguity. But the core message of the president's tweet is unmistakable. It's a criticism of a news story. The criticism is that President Trump believed he made a good decision, and the media lied to make him look bad. The tweet was not a book report describing the Washington Post's editorial view. It was not commending the Post on saying how Trump ended a massive, dangerous, and wasteful program. Those were his own words. And we know that this is the correct interpretation, not just from looking at the tweet itself, but also from looking at the context of the article and the follow-up comments to the Wall Street Journal. The government has argued that we conceded the point, but we included the text of the Wall Street Journal article in evidence in our cross-motion for summary judgment. We referred to it there. We referred to it again in the reply brief. What we were getting at in the footnote was that the tweet was essentially a but-for causation. Had there not been a tweet, none of this ever would have happened, and we wouldn't have had the grounds. But as the court recognized in the ACLU versus CIA case, the cumulative total of evidence is relevant. And that was what we were getting at here. That's why we submitted that in the evidence. With respect to the ACLU v. CIA case, the way that the Second Circuit read that case was that the totality of everything is what the court based its holding on. And that included statements by the CIA director, which demonstrated that the CIA had an intelligence interest in the drone program. So why isn't that the proper way to look at ACLU v. CIA? Well, in some sense, the facts in ACLU v. CIA were more robust in terms of the number of statements that were being made. But this court certainly didn't suggest that what was in ACLU v. CIA was necessary to trigger the doctrine, as the district court noted. Any one of those statements may have been sufficient. There just happened to be a number of them. However, this case is, in some respects, an easier case than ACLU v. CIA because the FOIA requests here are much broader. And so even less would be revealed. And the match between the request and the information is even more precise here because the request literally duplicates verbatim the information in the tweet. The Second Circuit's decision was also, I think, arguably dicta in that respect because the focus of the court was on the CIA being the agency about whom the documents were asked. In other words, the request was focused specifically on covert CIA programs, which is not the case here. As the district court noted in our case, there's essentially a continuum with certain cases on one side, the ACLU in the middle, and our case on the other extreme where disclosure of the Glomar fact would reveal the least because of the breadth of the request. As far as whether it was CIA versus some other entity. I guess I'm trying to understand that precisely, though, because if the request is broader, then there's potentially. And we say that they have to reveal the existence of documents either by a Vaughn index or some other fashion to allow the court to determine whether exemptions one and three apply to them. Nonetheless, I mean, isn't that disclosure, if they have to disclose the existence of more documents, isn't that harmful to the intelligence interests of the agency? Well, what they'd be disclosing here is something in the disjunctive, right? They have documents responsive to request part two or three or five or six. So that tells the public less about what they have than if the CIA had specifically, than if the request had been, you know, just part five. But it's really up to the CIA to figure out exactly how they want to assert their Glomar response. In this case, they did it. Parts one through three and five through nine, but they could, under the district court's order, simply say our new response is a much narrower Glomar in order to be tailored to protect the specific interests here. And so that's really a function of how the CIA has litigated the case. It's undisputed that the Glomar response would have been perfectly valid, but for the official acknowledgement, right? Right. So it's your burden to show official acknowledgement. Right. And that's a burden of production. We pointed to that, but the agency always maintains the burden of persuasion. And that was clear from ACLU. You think, sorry, you think it's the agency's burden to disprove official acknowledgement? I think the agency under FOIA always maintains the burden of persuasion. To show the exemption, to show that the exemption applies, or to show that the Glomar assertion is valid. I don't know, if you have an otherwise valid response and you say, well, it's forfeited by an official acknowledgement, is there a case that says it becomes their burden to disprove the acknowledgement? That was discussed in the ACLU case. And specifically what the court said, the burden on the plaintiff is the initial burden of production to point to, quote, to duplicate pointing to information in the public domain that appears to duplicate the information that's requested. And then the court went on to quote some previous FOIA case law, explaining that the burden of, well, the court didn't use the term burden of persuasion, but burden of proof is on the CIA. And I think that that's reasonable because the CIA is the one asserting a Glomar. And so all they're being asked to prove, they're not being asked to prove a negative or anything like that. They're being asked to prove that what they are saying is logical and plausible. And I think that that is a totally appropriate burden for them to bear. All right. Any other questions, Judge Katsas, Judge Randolph? No. All right. Thank you, Mr. Light. Mr. Busse, you had some time left. We'll hear from you on rebuttal. Thank you, Your Honor. I have two quick points to make. I'm also happy to take whatever questions the panel has. First, my friend on the other side made an argument here, an oral argument, that perhaps the tweet here should be taken as an official acknowledgement of some kind of U.S. government program. This goes back to questions, a dialogue I was having with Judge Katsas during my time at the podium. But I just want to point out, at page seven of their brief, plaintiffs say the opposite. They say, acknowledging the existence of responsive records would therefore not imply the payments were connected to the CIA or even the United States government. That's the basis on which this case has been litigated. And that's replicated at page 69 of the joint appendix, where the district court says that the payments could have come, quote, from somebody, end quote, end quote, not even necessarily the United States government, end quote. That's why the information at stake here is so important to protect. What we're talking about here is the CIA's intelligence interest or lack thereof. And also, crucially, its intelligence gathering capabilities or lack thereof to learn about payments made by some unidentified source to Syrian rebels. Now, of course, we don't think the tweet actually acknowledges any payments to Syrian rebels for reasons we've gone into. But even on the second step, they have to show that the GLOMAR has been overcome with respect to the CIA's interest. And that has not happened here. Secondly, to get to the colloquy that was occurring between Judge Wilkins and Judge Katsas and my friend on the other side about the breadth of the request here, the fact that it asks for a lot of different documents, that does not diminish the damage that would come from disclosure. It compounds it for all the reasons we give in the last two pages of our reply brief. And Judge Katsas, you're right. My friend on the other side has conceded that Exemption 1 applies to the GLOMAR response here. That means it's not in dispute that disclosure would harm the national security. The only question is whether there is an official acknowledgment that goes to the specific match test, which has not been satisfied here. And what's your answer on the question of burden of persuasion with respect to official acknowledgment? Who bears that? Your Honor, my understanding has always been that in the official acknowledgment context, the plaintiff has to point to an official acknowledgment and convince the court that it constitutes an official acknowledgment. I believe ACLU supports that. All right. Thank you. We have your arguments, and we'll take the matter under submission.
judges: Wilkins, Katsas, Randolph